Case number 17-1007. Leapers Incorporated v. SMTS, I think TRAMS, and Sun Optics. Argument not to exceed 15 minutes per side. Mr. Wassum, you may proceed for the appellant. Good morning, Your Honors, and may it please the Court. My name is Brian Wassum on behalf of Appellant Leapers Incorporated, and I've requested three minutes for rebuttal. Thank you. Your Honors, this is a trade dress case. The trade dress at issue consists of three elements. First, smooth, wave-like scallops over the cylindrical surface of a rifle scope in uniform peaks and valleys, up and down. Second element is those scallops extending straight back parallel along the length of the rifle scope. The third element is that each of those designs are uniform on each adjustment surface. In other words, every knob, every portion of the scope that can be rotated has the exact same design on it. That combination of three elements... For myself, Counsel, your briefing was helpful to have those photographs. Thank you. They were well done, so thank you for that. Thank you. I'm glad to hear that. We're well aware of what you're talking about. Okay, good, good. I think it's important to visualize to begin with. And the only basis, of course, for the functionality or the semi-judgment ruling in the District Court was the District Court's conclusion that that combination of elements was inherently functional. So much so, and so obviously so, that the Court need not trouble itself to examine the evidence that Leapers presented to the contrary. The question of functionality, Your Honors, is relatively straightforward compared to some of the legal issues that we consider, but it is not nearly so simplistic as what the District Court reduced it to. And because the District Court reduced it too simplistically, the District Court erred, and that decision should be reversed, and the question allowed to proceed to the jury. Both sides agree on what the governing law is. We quibble about vocabulary, but there's no question as to what law governs here. We start with Inwood, the Supreme Court decision, which says that a trade dress is functional if it is essential to the use or purpose of the article. And to the contrary, it is not functional if it is merely ornamental or arbitrary. We would submit that our design is an arbitrary one, because it was chosen for purely aesthetic reasons. There are a number, almost infinite, not literally infinite, but quite a number of combinations or designs that one could have put, or no design, on the adjustment surfaces. We chose this particular one. Is it fair to say that the District Court here boiled it down so simply, that because one has to put one's hand on the adjustable parts of the scope, that they are utilitarian? That's exactly what the judge did, yes, Your Honor. And that makes the wrong comparison. The comparison that the District Court looked at was grip versus no grip. That's not the question here. In fact, we don't even use, obviously, the word grip. We use design, because even a surface that is flat can be gripped. We chose this design, this particular scalping design, for aesthetic reasons. And it can be gripped. Function can be applied to it. But that function is inherent to the adjustment itself, not the design, the aesthetic design that is placed on the exterior of that adjustment. Do you agree that choosing it for aesthetic purposes alone is not enough? I'm not sure I do, Your Honor. I think that if there is uncontradicted evidence in the record that the designers chose it for purely aesthetic reasons, which is exactly our record here, that that is sufficient evidence to proceed to the jury. Will it prevail as a matter of law in the face of contrary evidence? Not in every case, but I think that it's sufficient. And I think that, Your Honor, that is consistent with what you argued in your dissenting opinion in the Gronovel case. That's my point, that was a dissent. Correct, correct. But I don't, I think that this case, the facts of this case, Your Honor, present a helpful fact pattern to perhaps correct some of the excesses of the Gronovel opinion. That under these facts, we have uncontradicted evidence. In fact, the testimony. Let me ask you a different question. Do you lose if it's not enough? No. No, I don't think so at all. Because there's, for one thing, there's no objective evidence to the contrary. We also have in this record, which we didn't have in Gronovel, we have rulings from the USPTO, we have rulings from the California Secretary of State that says these are registrable trade dresses. The examiner in the USPTO looked at this twice, considered all the evidence that Leepers presented, considered our express argument that this is not a functional design, and ruled in our favor on that issue. That, as we've explained in our brief, that isn't necessarily conclusive. You're not required to defer to that, but that is evidence that the jury ought to hear. Right, but there's more to that finding than that it was chosen for aesthetic purposes, right? Well, there is more to it. There is objective evidence. We have, for example, the Cocalis testimony that says I know these designs. I've been in this industry for 30 years. I've deployed into combat with these designs. And if it had been chosen for functional purposes, it would have looked differently. There is more than just the testimony of the designer. And even here, Your Honor, even if we look, Gronovel versus this case, at the testimony of the designer, the criticism of the Gronovel majority was that the designer had merely mouthed the words, oh, no, this is not functional because look at all the other things I could have chosen. These designers did more than that. David Ding, the person for Leepers who designed this, said, look, I chose this for aesthetic reasons. I was trying to make a look. I never even thought of functional considerations. These didn't influence my decisions, which is the test that the Gronovel majority articulated. And I have an element here. For example, the third element of our trade dress is that each of the designs, each of the adjustment surfaces has the same design. If you look at all the competitive products listed and photographed in the Cocalis report, you see that most of them have different designs on different adjustment surfaces. There is no possible functional motivation to put the same design on every surface but to create the aesthetic appearance of uniformity. Well, what about there's another step, which is, you know, is it significantly more economical? Is that a factor? I mean, is tooling a factor that you only need one type of tooling or something if you make them all the same? I don't know. I'm asking. Not on this record, Your Honor. There's no evidence on that fact on this record. That's why both sides have focused on the essential to the use or purpose, and we've stopped there. It's also, Judge? Just clear my throat. I assume you're going to address the secondary meaning issue. I'd be happy to do so. Your Honor, the district court may not have reached a definitive conclusion, but I think it went far enough to realize this is a messy, fact-specific, complicated series of factors that this court has said before isn't subject to summary judgment in the normal case, unless it's just obvious and overwhelmingly so. But here there is sufficient evidence, and the court only looked at two factors. It's hard to even reverse a consideration that only considers two out of the seven factors. But there is evidence that the court did look at, for example, the testimony of the distributors, and evidence that the court faulted us for not having, which is actually in the record, such as testimony directly from consumers. We have the Chad Rouse declaration in the record, who is an end user who testified that I see this pattern as having secondary meaning, as indicating Leapers is the source to me. And he goes on to say he was actually confused because he purchased the defendant's product. So that is strong testimony that weighs in our factor, that makes the court's decision below not to rule on secondary meaning even stronger. I will grant you that our service, Your Honor. I doubt if this is in the record, counsel. I'm just curious. Is Leapers considered in the gun world a high-end product so that I would be, when I'm shopping, I would be pleased to see, wow, that's a Leapers. It has that wonderful design. Is it? I mean, is it in the record? I have no idea why that's. You know what? I believe there is sufficient record evidence in the testimony of my two principals to say that they are a mid-market product. They are not the cheapest. In fact, they're more expensive than the defendants. I didn't hear your adjective. They were what product? Mid-market, Your Honor. Mid-market. Middle of the road. That answers it. Got it. Okay, yeah. The defendant's product is cheaper. We have some adjectives for that that I won't repeat here. But it's not the highest end. Brands like Leopold, for example, are the higher end. But I would be proud to have a Leapers scope, but I'm biased. The sales evidence, the advertising evidence, Your Honor, they, for example, defendants fault us for not calling out the design in our advertisements as trade dress. And yet we have full page ads with a picture of the product. And, of course, the most prominent feature externally on that product is this design. So we're putting this design out in the market's face as representing our product. If I could swing back to the functionality argument, Your Honor, unless you have another question on secondary meaning, I would point out that if the district court is right, the USPTO has to be wrong. And that goes back to the observations we made about the Coca-Cola bottle and their decision, the USPTO's decision to register the Nightforce design. The what? The Nightforce. That's the name of the other company that got a registration for their scalloping design on their scope. And that happened just a year or two before this issue arose. And the PTO issued a registration for that design. And defendants in their briefing have admitted that, yes, that is a distinctive design. It has secondary meaning. It's not functional. That ought to have been registered. They don't challenge that decision. But that leaves you in an odd position because if the USPTO is right in issuing that registration, which everybody seems to agree, then the district court has to be wrong because the Nightforce design is just another type of scalloping. It's just another type of, if you want to use the word, this is not my word, but defendant's word is grip, the district court's word is grip. It's another design on an adjustment surface. And if it can have secondary meaning, ours at least has the possibility of having secondary meaning. It ought to go to the fact finder to determine if it has secondary meaning. And the district court must be wrong that the fact that it's on an adjustment surface disqualifies it from having non-functionality and secondary meaning. Thank you. Thank you. Good morning. May it please the court. My name is Joe Cleveland. I'm a lawyer from Texas and represent the Texas defendant, Synoptics USA. In my time here today, I would like to address, hope to address, two issues of why the plaintiff, Leapers in this case, has failed to meet its burden of proof on non-functionality and secondary meaning. With respect to burden of proof, all they have to do is show that it's a material factional dispute that we're dealing with here. Yes, Your Honor. That's true. But they still have the burden of persuasion in that summary judgment motion. All right. So as the Supreme Court has repeatedly held, a product feature is functional. It cannot serve as a trademark if it is essential to the use or purpose of the article or if it affects the cost or quality of the article. The plaintiff, therefore, must carry a heavy burden to prove the feature is non-functional by establishing it's merely ornamental, incidental, or arbitrary aspect of the device. Leapers' scallop-shaped knurling on the adjustment knobs of its scopes is not merely an ornamental, incidental, or arbitrary portion of the device. It's the reason the product works. The knurling allows somebody to grip the surface of the knob without using tools and to make precision adjustments, whether it's in a rain condition or a cold condition while the user is wearing a glove or whether the adjustment knob and the gloved hand are wet. It allows that gripping surface to allow the adjustments to be made. The knurling is an essential... Is it your contention that the knob couldn't be adjusted if that knurling was not on there? If it's a slick knob, we have testimony from our expert, Mr. Capelson, who tested the knob, a slick knob, in inclement weather and was unable to turn the knob with a gloved hand. So the knurling is essential to be able to adjust that in a weather... But is that really all that pertinent in that if that were true, different kinds of designs in knurling would serve the same purpose, the same function? So that really sounds a little bit beside the point, don't you think? Well, the Supreme Court in this Court has also held that it's an error for this Court to consider alternative designs. The issue is whether this design, and specifically... This design with that, I won't say rough surface, but uneven or curdling design could be... The function aspect of that could be done with any number of designs if a design is needed for that. There are numbers of knurling surfaces that can be used, but the Court requires... Is that apparently your word? Who came up with that word? Scalloping or knurling? Knurling, I guess. That's the one that seems to be in the pleading siren. Right. The knurling... Well, the scalloping design is something that the plaintiffs stipulated to is what they call their design, a scalloped or a scalloped edge, but a knurl is a gripping surface. That's what a definition of a knurl is, a gripping surface. Well, if it were more like, rather than smooth, if it were sandpaper, abrasive... It would be a knurled... It would permit gripping, yet it would have no design to it particularly. What say you about that? That's a knurled surface, and that would be... That's called knurling, too. That's called knurling also. Okay. I wondered about that. Right. So any gripping surface is a knurled surface on a gun. And every gun has to have a gripping surface. I take it that each has to have, or they're better, if they were equipped with adjustments to the scopes. That's correct. So... Every knob has to have a gripping surface, but the question is whether this is an ornamental or arbitrary... But functionality comes from, I may turn it. Correct. So the scalloping, how do you argue around scalloping is distinctive but not necessarily functional? Well, there is... I think you would have to have both in some instances, because, for example, the Night Force scope, the scope that was mentioned earlier, has this... Is there photographs of that in here? Yes, Your Honor. In our brief, there's a photograph of that, which has a unique fish-scale type design. And so if the plaintiffs had come up with an interlocking horn design on this knurled part, there would be an arbitrary ornamental feature to the design. But they've chosen a design that's very common in the industry, a very common design that's used in a number of scopes that are offered in this sphere. So there are other manufacturers like you, like your company, that have adopted this scalloping design? There's two companies that adopted the scalloping design before Leapers did. Bushnell has... And this is in the record also. Bushnell adopted this identical design in 2003. And Tasco adopted almost a virtually identical design in 2004, I believe. So this design is a common design used by major companies like Tasco and Bushnell that were long before Leapers entered the market. So to suggest this is some unique ornamental design is really not supported by the record at all. The evidence... Did Bushnell register? I'll take Bushnell. Did they register this design? No, Your Honor. But Bushnell's design has a different pattern, right? No, Your Honor. It's identical. It's exactly the same? Exactly the same. This is in the record. And there's a photograph in our brief. It's exactly the same, and it came before Leapers. The only difference is that Bushnell has a shiny finish and the Leapers scope has a matte finish. It's just the finish. But not the shape or the knurling design or anything like that. It's identical. So there's no infringing by Leapers, even though Bushnell was first. Shiny, but first in the scalloping. They didn't seek to register it, to protect it. Leapers, on the other hand, did. Does that not make a difference to the argument? You have to look at what is the ornamentality or the arbitrariness of this design. There's nothing ornamental about it because people were using it before. And it was a common... How does that make it not ornamental? Well, it has to be. The ornamentality... You're focusing on functionality, are we not? Yes, but that's part of the test of functionality. It's whether or not it's ornamental and arbitrary. And so I think you have to look at... Essential to use or purpose. Right. Or affects cost or quality. That's the way by which we judge it, correct? And then the other opposite view of that test is whether it's merely an ornamental, incidental, or arbitrary aspect of the device. And so those are the things that you're looking at as a court, is to say, okay, is this useful to the purpose or use of the product, and whether it's ornamental or arbitrary. And I think the design itself is utilitarian. It's common. It's used in the industry. The district court did not seem to take that view. As argued by counsel for Leapers, the district court said that's an adjustment part of the gun. So it's utilitarian. It's functional. It seemed to me when I read it that it was that simplistic, that it wasn't really an evaluation, that there were others in the industry who used it. Did I miss that part? No, Your Honor, but this court is sitting de novo. They're sitting with giving no deference to what that judge did or said. And so you get to decide here on your own, on the papers that are before you, in a de novo situation about what you determined to be functional or not functional, and give no deference to what the district court said. Well, as Judge Clay pointed out, we're really looking at whether there's established here an issue of fact. Correct, Your Honor. Okay. That's correct. And so if I may, I'd like to turn to the secondary meaning briefly, because the plaintiff must also prove the design acquired secondary meaning. In other words, the evidence must prove that in the minds of the public, the primary significance of the product features to identify the source of the product and not the product itself. Leapers' evidence, however, did not come close to meeting this heavy burden of establishing secondary meaning. They offered some affidavits of distributors that were, that were conclusory, and they offered a few, I think one or two customer affidavits, but this court has held that one or two customer affidavits and distributors affidavits is insufficient to create a tribal issue. I think what this court really focuses on are secondary meaning surveys, and both parties conducted secondary meaning surveys in this case. And if I may, I'd just like to describe for you what those, how those surveys were conducted and what the results of those surveys were. The defendants identified the relevant universe is purchasers or potential purchasers of rifle scopes. And the sample size was 412 respondents of that universe. 194 of those respondents indicated that they were somewhat likely or likely to purchase a rifle scope in the future. And 218 respondents indicated they purchased or considered purchasing a rifle scope in the last 10 years. This is, both parties conducted what are called online surveys. And so they showed a picture, in the defendant's survey, the defendant showed a picture of a leaper scope, but obliterated or masked the logo. So all it showed was the actual scope and the shape of the scope. And the respondents were then asked the critical question in a secondary meaning survey, was this scope put out by one company, more than one company, or don't you know? 12.9% of the respondents answered that it was put out by one company. And this court has held that greater than 50% is some indication of secondary meaning, 38% is marginal, and 26% falls short of any sufficient probative evidence. Now, the leapers also points to their surveys. They conducted three surveys, but they only point to two. Even our district court here who said he found some value to the secondary meaning. Let me discuss their evidence, if I may, Your Honor, to describe why he may have gotten off on that and a little bit confused. But the survey number one, leaper survey expert, found that when presented with a leaper scope, 9% of the respondents answered yes to the question, do you know who puts out this scope? Which is, again, well below the court's threshold. And the respondents identified 40 different brands of scopes. Then the third survey, survey number three, which is where the plaintiffs are putting all their weight on, is the respondents were shown a photographic array of three identical  Do you think the scopes above are made or put out by the same company or different companies? And there's a problem with the test at the outset, because there's a perception bias because the participants were shown three identical scopes of leapers, and it's likely inflated the number of same company responses. But nevertheless, 61% of the respondents in that survey, which is above the 50% threshold that this court indicated, responded that it was the same company. But you have to go to the next question, which is a very critical question in that survey, that was asked, what are the reasons you think these scopes are made or put out by the same company? And only 18.5% mentioned anything about the adjustment parts, and only nine respondents, nine, less than 1.1% of the respondents identified the knurling, ridges, grooves, or textures of these parts. So both parties' surveys showed that the public, which this case is really all about, what the public believes or perceives these scopes to be from a single source, did not even meet the threshold of 38%. This court has found to be some indication of secondary meaning  It sounds very persuasive, counsel. Although there's a seven-part test for secondary meaning, and you're only addressing part of that, so there are other factors. Yes, I'd be happy to address those too. But what I wanted to ask is, if we think that the record shows that there's enough evidence to suggest that your client intentionally copied the plaintiff's designs to capitalize on the plaintiff's goodwill or reputation, then the issue would arise, and you don't have to agree with that, but then the issue would arise as to how has your client rebutted the presumption as to your client's reason for the copying. And I'm just wondering what evidence would you point to in that regard? I'd be happy to address that, Your Honor. The SunOptic scope uses the exact same design as the Bushnell scope, and the exact same design as the... Why was this registration permitted in light of your view that everything is all... They ought not to have been able to register. There's not been a federal registration of any Leeper scope. So to go back to your question, Your Honor... But you keep talking about the design. These other companies had the same design, but they had a different matte finish or whatever, and the color and the finish is a part of the design. If we're talking about aesthetics, wouldn't all those be design factors? No, Your Honor, it's not a claim feature. Color and matte and finish is not a claim feature of this trade dress. It's only the shape of the knurling or the knob. Does the Bushnell design have cuts in it? Yes, identical. But their design doesn't have cuts in it. If you look at the Bushnell scope, and we have expert testimony on this, undisputed expert testimony on this, that the Bushnell scope and the Leeper scope are identical in shape. Identical. You mean the knob? The knob. The adjustable parts are identical in shape. With vertical cuts? Yes. And so... That's a question you may not... I'd like to answer that, Your Honor, because you were asking me what evidence is there to rebut this intentional copying claim. And as I was mentioning to you, the Sun Optics uses identical scalping shape as the Bushnell and the Leepers, but they put their logo on it, as did the other defendants. And there's a case that says, where a party conspicuously uses its own trademarks, it would be error to infer secondary meaning based on intentional copying alone. So that factor is one of seven factors. But all the defendants display their respective trademarks on the product prominently, and that completely negates defendants' claim that intentional copying is sufficient in and of itself to show secondary meaning. Thank you, Your Honor. Thank you. If I could, Your Honors, I'd move in reverse order. So the Bushnell scope, we would dispute, and we have disputed, that it's the exact same. Is it similar? Sure. Is it highly analogous to ours? Perhaps. Is that a question for the jury? Absolutely. That issue has not been litigated at the summary judgment stage enough to where the district court even felt it necessary to rule on that issue. And it certainly has no bearing on functionality. Even if they are the same design, they are either both functional or not functional, and the evidence suggests that we have created an issue of fact, that they are, in fact, not functional. We've also answered the point by observing that the Bushnell scope, as far as we can tell, was only sold one year. There's no evidence as to its exclusivity of use, when it was sold, just how similar the marketplace perceives it as being. This is a throwaway issue that appears in one of the briefs, has nothing to do with functionality, and is only one of many factual points to consider on secondary meaning. Your Honor. Registration, if you would, for a moment. Yes. Just registration. Sure. The brief says that you did achieve registration. The brief says we achieved allowance, which is the step before registration. The examiner reviewed our application, initially denied it, when we argued. It allowed the leaper's application to proceed to registration. Right. It allowed it to move to that step. What comes next, and we explain this in our reply brief as well, but it is a very arcane procedure. Once it's allowed, there's a 30-day period in which third parties can come in and file an opposition. That has been done. Both defendants here filed oppositions. Bushnell filed an opposition. So that then proceeds into administrative litigation, called an opposition proceeding. That's the proceeding that has been stayed pending this decision. Got it. As far as the examiner is concerned, it may be registered, but they've gummed up that process a little bit. Judge Cook, to answer your question on knurling, that is not our word. That is a word that defendants pulled out of the dictionary to describe our design that we call scalloping. But, no, we don't use that word. We don't use the word grip. But they cite Capleson, for example. Their expert, who they claim is undisputed evidence that the Bushnell scope is exactly the same and that our grip is functional. There is a motion to disqualify Capleson under Dawbert, which the district court hasn't ruled on. There are motions as to the expert reports, including ours, and arguments we've made about their JUCM, secondary meaning survey, which the district court hasn't ruled on. Those issues are not ripe for this court's review. And, Judge Clay, you're correct that there is unrebutted testimony as to the intentional copying. Their defendant, Charms, who Mr. Cleveland does not represent, was our former supplier. They're the ones that manufactured our scope, and they just kept doing so after we terminated our contract. I see my time is up, unless the court has any further questions. Thank you very much. Thank you, Your Honor. And the case is submitted.